971 A.2d 1074

R.L., PLAINTIFF–RESPONDENT, v. KENNETH VOYTAC, DEFENDANT–APPELLANT.

Argued February 18, 2009—Decided June 11, 2009.

*William G. Johnson* argued the cause for appellant (*Johnson & Johnson*, attorneys).

*Victor A. Rotolo* and *Marci Hamilton,* a member of the Pennsylvania and District of Columbia bars, argued the cause for respondent (*The Rotolo Law Firm,* attorneys; *Mr. Rotolo, Ms. Hamilton,* and *E. Carr Cornog III,* on the briefs).

*Stephen C. Rubino* submitted a brief on behalf of amicus curiae The Survivors Network of those Abused by Priests (*Mr. Rubino,* attorney; *Mr. Rubino* and *Charles L. Allen,* on the brief).

Justice WALLACE, JR., delivered the opinion of the court.

At issue in this matter is the interpretation of the statute of limitations provision of the Child Sexual Abuse Act (the Act), *N.J.S.A.* 2A:61B–1. The Act provides in relevant part that an action for child sexual abuse shall be brought within two years after the "reasonable discovery of the injury and its causal relationship to the act of sexual abuse." *N.J.S.A.* 2A:61B–1b. Additionally, the Act provides for a tolling of the statute of limitations because of "the plaintiff's mental state, duress by the defendant, or any other equitable grounds." *N.J.S.A.* 2A:61B–1c.

We conclude that pursuant to the Act, the trial court must first determine when a reasonable person subjected to childhood abuse would discover that the defendant's conduct caused him or her injury. That is an objective test. If that period is more than two years prior to the filing of the complaint, then the court must next determine whether the statute should be tolled because of "the plaintiff's mental state, duress by the defendant, or any other equitable grounds." *Ibid.* This is a subjective test.

## I.

We summarize the evidence presented at the *Lopez*[1] hearing and the procedural history. Plaintiff was nine years old when he met defendant, his mother's boyfriend, in 1987. Approximately one year later, when plaintiff was sleeping on the couch, he awoke to find defendant's hand inside his pants. After defendant married plaintiff's mother, a similar incident occurred. Plaintiff explained that he "didn't have a problem" with defendant's sexual conduct, describing the acts as "somewhat pleasurable" that made him feel "special." Plaintiff indicated that he and defendant engaged in five to ten sexual encounters between 1988 and 1990.

Plaintiff did not reveal defendant's conduct to anyone until he was much older, explaining that defendant told him it "might not

---

[1] *Lopez v. Swyer,* 62 *N.J.* 267, 300 A.2d 563 (1973).

be a good idea to tell anyone" about their sexual activity. Plaintiff stated that he never repressed the memories of the abuse and that he was always aware of what happened. Defendant terminated the abuse when plaintiff was in the latter half of the sixth grade.

A short while after the sexual contact ended, plaintiff began cross-dressing. He would wear his mother's undergarments and masturbate. Plaintiff eventually became convinced that he was actually supposed to be a girl. His interest in cross-dressing coincided with a decline in the quality of his academic work and social interactions. His grades dropped throughout high school, particularly after his mother divorced defendant. During high school, plaintiff frequently abused alcohol and marijuana, and he was arrested for theft and for driving while intoxicated. Throughout this time, his mother noticed that he frequently was depressed.

During his senior year in high school, plaintiff began seeing a psychologist, Dr. David Durka. He met with Dr. Durka eighteen times between March and December 1996. Most of their conversations concerned plaintiff's recent break-up with his girlfriend and his poor school performance, but did not include any references to his childhood sexual encounters with defendant, his cross-dressing, or his gender confusion.

After graduating from high school, plaintiff saw defendant on two occasions, on one of which plaintiff actually spent the night at defendant's house. Although plaintiff was hoping for a sexual encounter with defendant, no sexual contact between the two of them transpired.

At some point in 1999, approximately three years after graduating from high school, plaintiff began dating Sally Apple.[2] In October of that year, plaintiff, then age twenty one, was engaged in oral sex with his girlfriend when he had a "flashback" of a similar sexual encounter with defendant. Plaintiff immediately

---

[2] We use fictitious names throughout in order to protect the privacy of the individuals involved.

explained to Sally that he was not feeling well and began crying. The next morning, plaintiff revealed to Sally that defendant had "done things" to him as a child. Sally expressed concern, but plaintiff said it was "not that big of a deal." That was the extent of plaintiff's discussion with Sally about his prior abuse.

Later that day, plaintiff became irritable at work, left early, and walked home. He telephoned his mother and asked her to come home. Once his mother arrived, he explained that defendant "had done things" to him as a child, but did not elaborate or provide further details. Plaintiff said that his mother expressed great concern and appeared upset. He told her that it was not a big deal, and it was in the past. His mother responded that we "need to deal with it" and "there's no way it hasn't affected you."

Plaintiff did not seek help or discuss the abuse again for more than three years. Although the frequency of plaintiff's intimate encounters gradually declined, he did not have any additional flashbacks while engaging in sexual activities with Sally.

Plaintiff's interest in cross-dressing, however, magnified. He continued to question his gender and wondered whether he was supposed to be a girl. He described feeling ashamed, guilty, and "really horrible" about himself. At that time he began to develop an interest in transgendered pornography.

Plaintiff's growing shame culminated in a conversation with his co-worker, Sandy Jones, toward the end of February 2002. Sandy noticed that plaintiff seemed bothered by something and she asked him what was wrong. Plaintiff responded that he did not feel right. When Sandy prompted him for more information, plaintiff revealed that at times he wore women's underwear and was confused about his gender. Because Sandy previously had worked as a camp counselor and received some training in detecting child abuse, she asked plaintiff whether there was something in his past that might be related to the cross-dressing, and specifically asked whether he had been sexually abused. Sandy recalled that plaintiff sat back, took some deep breaths, and replied "yes." Sandy then asked whether he thought there was a

connection between the abuse and his cross-dressing. Sandy said that plaintiff again sat back, looked pensive, and a shocked expression came across his face, "like a light bulb kind of look." Sandy suggested that plaintiff should see a psychiatrist.

Plaintiff described his reaction to the conversation with Sandy as one of shock, because previously he had never made a connection between his cross-dressing and the childhood sexual encounters with defendant. He had thought he was born that way and never considered that the sexual abuse was the source of his condition.

Shortly after the conversation with Sandy, plaintiff made an appointment to see his former psychologist, Dr. Durka. Prior to his appointment, plaintiff wrote two memoranda setting forth his thoughts. In the shorter memo dated February 28, 2002, the same date he met with Dr. Durka, plaintiff described the anxiety he felt as he was about to see Dr. Durka; the second, which was undated, indicated that he was confused about his gender identity but was beginning to "realize that [cross-dressing] is probably a direct result of what happened to [him]." He also commented that "certain events" in his past had revealed "repressed emotions," most notably an "event ... with [Sally] my girlfriend." Initially, plaintiff did not recall when he wrote the undated memo, but later he said that he typed it "during the week between the conversation with Sandy and the appointment with Dr. Durka."

When plaintiff met with Dr. Durka on February 28, 2002, Dr. Durka observed that plaintiff appeared "shaky" during their session. However, by the second session plaintiff had grown more confident and assertive. Dr. Durka noted that plaintiff believed that a recent conversation with a co-worker had triggered his desire to resume counseling. Dr. Durka did not recall when that conversation took place, but he believed it was "towards the end of 2001 or the beginning of 2002."

Shortly after resuming therapy with Dr. Durka, plaintiff contacted a lawyer at the firm where his mother worked as a paralegal. The lawyer then referred him to a series of psycholo-

gists. Plaintiff visited therapist Ken Singer for several sessions and then visited another therapist, Jay D. Kuris. Dr. Kuris explained that plaintiff told him that he used to think about the sexual contact with defendant and get depressed. Dr. Kuris, who prepared a report in anticipation of litigation, related that plaintiff had analyzed his situation obsessively for a year.

On February 13, 2004, plaintiff filed a complaint alleging that defendant sexually abused him as a minor in violation of the Act. He claimed that he suffered severe psychological and emotional injuries and sought compensatory and punitive damages under the Act. Defendant filed an answer in March 2004. During discovery plaintiff sought, without success, defendant's computer hard drive and computer items. Plaintiff eventually sought to include a claim for spoliation of evidence, but his motion was denied.

Meanwhile, defendant filed a motion for summary judgment, asserting that the complaint was filed beyond the two-year statute of limitations period in the Act. The trial court held a plenary hearing to consider whether plaintiff's complaint was timely under the Act's statute of limitations. Plaintiff and former co-worker Sandy testified as set forth above. Ralph Battinieri, a social worker with a doctorate in human sexuality, testified and submitted a report as an expert in the fields of clinical social work and child sexual abuse. Dr. Battinieri found no evidence to suggest that prior to February 2002 plaintiff connected his childhood abuse to his cross-dressing and depression. Dr. Battinieri described the connection as a "gradual process," suggesting that plaintiff did not fully connect the abuse and his injuries until well after the counseling sessions with Dr. Durka resumed. Dr. Battinieri opined that plaintiff's reaction during the 1999 fellatio incident with his girlfriend was "merely a flashback" and "a preamble to the beginning of awareness." He further stated that plaintiff's subsequent conversation with his mother did not create a connection because plaintiff failed to respond to her comments or to immediately seek psychological treatment. Finally, Dr. Battinieri asserted that plaintiff never told others about the abuse because defendant placed him under great duress to hold that secret.

Pamela Moss, a psychiatrist, also testified and submitted a report on plaintiff's behalf. Dr. Moss opined that plaintiff did not make the connection between the abuse by defendant and his psychological injuries until after the February 28, 2002 session with Dr. Durka. She concluded that plaintiff's cross-dressing, depression, drug and alcohol abuse, as well as the "flashback" incident with his girlfriend, were insufficient to make the connection. Moreover, Dr. Moss described defendant's abuse as "psychologically coercive," which explained, in part, why plaintiff took so long to connect the abuse to his resulting injuries.

Defendant countered with the expert testimony of Louis B. Schlesinger, a psychologist. Dr. Schlesinger opined that plaintiff connected the abuse to his psychological injuries no later than his "flashback" incident in 1999, but that he may have become aware of his injuries even earlier—perhaps when he first recognized as a teenager that his interest in cross-dressing and transgendered pornography was "abnormal." Dr. Schlesinger claimed that once defendant left the family home and did not threaten plaintiff, any prior duress abated.

The trial court concluded that the cause of action had accrued more than two years before plaintiff filed his complaint on February 13, 2004, and that plaintiff failed to present any justification for tolling the statute of limitations. The court found highly significant the fact that plaintiff never suppressed the alleged abuse by defendant, declaring that the "flashback" with his girlfriend and his response demonstrated that he had some level of understanding that defendant's conduct was wrong and injurious to him. The court cited plaintiff's description to his girlfriend of the abuse by using the words "sexual [sic] molested," which carried a negative connotation, and explained that the use of such a loaded term indicated that plaintiff was aware of the abuse's inherent wrongfulness.[3]

---

[3] The transcript does not reflect that plaintiff used the words "sexual molested" to describe his abuse to his girlfriend. On cross-examination, plaintiff

The court further observed that plaintiff's conversation with his mother, and her advice to him to "deal with this" and that "there's no way it hasn't affected you," was sufficient to put plaintiff on notice of the possible psychological effects of sexual abuse. Moreover, it stated that plaintiff's cross-dressing after the sexual encounters with defendant indicated plaintiff's awareness on his part.

The court also noted that, although plaintiff and Sandy both testified that their conversation concerning the abuse occurred in mid- to late February 2002, it would rely on Dr. Durka's testimony that plaintiff told him the conversation took place "towards the end of 2001 or the beginning of 2002." The court also explained that the two memoranda plaintiff wrote in preparation for his February 28, 2002 meeting with Dr. Durka were "highly literate [and] well-written," and therefore not the type of documents that could have been written in only two weeks. Consequently, the court concluded that it was far more likely that plaintiff's conversation with Sandy occurred sometime earlier than February 13, 2002, which was the deadline for plaintiff to satisfy the two-year statute of limitations under the Act. Finally, the court succinctly declared that there was nothing in the record to support tolling of the statute of limitations.

In a published opinion, the Appellate Division reversed and remanded for trial. *R.L. v. Voytac*, 402 *N.J.Super.* 392, 397, 954 *A.2d* 527 (App.Div.2008). The panel began its analysis by noting that the Act is a remedial statute and should be interpreted liberally. *Id.* at 402, 954 *A.2d* 527. Explaining that child sexual abuse cases present unique difficulties in determining when a cause of action accrues, the panel found that a victim may have a conscious memory of the sexual abuse, but may not have " 'reasonably discovered' " its causal connection to any subsequent serious

---

explained that although he did not recall the exact words, he was fairly certain he said that defendant had "done things" to him as a child. He did not provide any additional description.

psychological injury or serious mental illness. *Id.* at 402–03, 954 A.2d 527 (quoting *N.J.S.A.* 2A:61B–1b). The panel determined that the trial court incorrectly based its decision "on the fact[ ] that [plaintiff] had no repressed memories of the abuse and had a flashback of the abuse in 1999 during the incident with [his girlfriend]." *Id.* at 404, 954 A.2d 527. Relying on two California appellate cases, the panel held that plaintiff did not appreciate that the abuse caused his emotional injuries until undergoing psychotherapy after his February 2002 conversation with Sandy. *Id.* at 404–05, 954 A.2d 527. Based on that conclusion, the panel found no need to consider the tolling issue because the complaint was filed within two years of the accrual of the action. *Id.* at 405, 954 A.2d 527.

We granted defendant's petition for certification, limited solely to the issue of the standard to be applied to determine whether the statute of limitations in the Act has run. 197 *N.J.* 259, 962 A.2d 530 (2008).

II.

Defendant argues that the Appellate Division erred by reviewing plaintiff's claims under a subjective standard rather than an objective standard. He asserts that the panel, in addition to considering plaintiff's actual knowledge, should have also examined how a reasonable, ordinary person would have reacted under similar circumstances. He further claims that plaintiff should have realized that his sudden, emotional reaction during the flashback with his girlfriend was causally related to his prior sexual abuse, and that the conversation with his mother should have put plaintiff on notice of the possible psychological effects of the abuse. Defendant adds that plaintiff's undated memo written shortly before he returned to Dr. Durka indicated that plaintiff recognized the flashback as the beginning of his "emotional discovery" linking the abuse to his subsequent injuries. Further, defendant contends that Dr. Schlesinger's expert opinion supported the

court's finding that plaintiff made or should have made the connection after the "flashback" incident with his girlfriend.

Plaintiff disagrees with defendant's assertion that the Appellate Division failed to apply an objective standard, and argues that a cause of action does not accrue as soon as the plaintiff develops mere "suspicion" that his present injuries are linked to his prior abuse. Plaintiff contends that he could not have reasonably discovered the link between the abuse and his injuries until he began psychological counseling following his conversation with his co-worker. He claims that prior to that revelatory conversation, he attempted to suppress and avoid his problems in several ways, including convincing himself that he was simply born that way. Plaintiff asserts that he could only overcome those subconscious coping strategies with the assistance of a psychologist, which in turn allowed him to recognize that his problems were actually "injuries" related to defendant's abuse.

### III.

#### A.

In 1992, the Legislature adopted a statutory cause of action for sexual abuse. *See N.J.S.A.* 2A:61B–1. The Act provides that "the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse," and that the "action shall be brought within two years after reasonable discovery." *N.J.S.A.* 2A:61B–1b. Thus, the statute of limitations for a cause of action pursuant to the Act is two years "after reasonable discovery."

Notably, in addition to a flexible statute of limitations, the Act contains a broad tolling provision:

Nothing in this act is intended to preclude the court from finding that the statute of limitations was tolled in a case because of the plaintiff's mental state, duress by the defendant, or any other equitable grounds. Such a finding shall be made after a plenary hearing. At the plenary hearing the court shall hear all credible evidence and the Rules of Evidence shall not apply, except for Rule 403 or a valid claim of privilege. The court may order an independent psychiatric evaluation of

the plaintiff in order to assist in the determination as to whether the statute of limitations was tolled.

[*N.J.S.A.* 2A:61B–1c.]

"Accrual" refers to the date when the statute of limitations begins to run, and "tolling" refers to a pause in the running of the statute once it has already accrued. This case requires us to interpret both the accrual provision and the tolling provision of the Act.

 The primary goal in interpreting the Act is to discern the Legislature's intent. *See Hardy v. Abdul–Matin,* 198 *N.J.* 95, 101, 965 *A.*2d 1165 (2009). The first step in the analysis is to examine the plain words of the statute by giving them their ordinary and commonsense meaning, and " 'read[ing] them in context with related provisions so as to give sense to the legislation as a whole.' " *Ibid.* (citing and quoting *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). Only if the statutory language is susceptible to more than one interpretation is there a need for the court to resort to extrinsic evidence in determining the correct interpretation. *Hardy, supra,* 198 *N.J.* at 101, 965 *A.*2d 1165 (citing and quoting *Lozano v. Frank DeLuca Constr.,* 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004)).

We recently explained that "a broad reading of the [Act] comports with the legislative goal to interpret remedial statutes liberally." *Hardwicke v. Am. Boychoir School,* 188 *N.J.* 69, 90, 902 *A.*2d 900 (2006). Further, we observed that "a paramount goal of the Legislature is to keep children safe and to identify those who abuse them as well as those who facilitate the abuse." *Ibid.*

## B.

 With the foregoing principles as our guide, we turn first to interpret the accrual provision. The Act provides that a cause of action accrues "at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse." *N.J.S.A.* 2A:61B–1b. The plain words of the Act identify two events that

must occur before a cause of action may accrue: the "reasonable discovery" of both (1) the existence of the injury and (2) the causal relationship of that injury to the acts of sexual abuse. This two-pronged approach was established "[b]ecause of the unique nature of sexual abuse, which may only be discovered by an adult victim after years of repression." Senate Judiciary Committee, Statement to S.B. 257, February 24, 1992, at 1, *reprinted in N.J.S.A.* 2A:61B–1.

■ In adopting the "reasonable discovery" standard, we believe the Legislature intended to import our jurisprudence regarding the "discovery rule" into child sexual abuse cases. That rule was adopted to avoid the "sometimes harsh result of a mechanical application of the statute of limitations," and is "essentially a rule of equity." *Martinez v. Cooper Hosp.-Univ. Med. Ctr.,* 163 *N.J.* 45, 52, 747 *A.*2d 266 (2000). We have examined the history and principles underlying the discovery rule on numerous occasions and need not repeat them here. *See generally id.* at 51–54, 747 *A.*2d 266. Suffice it to say that the discovery rule provides that in an appropriate case the limitations period does not begin to run "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer,* 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973). In applying the discovery rule it is necessary to consider all relevant facts and circumstances. *Id.* at 275–76, 300 *A.*2d 563.

■ Because the discovery rule is essentially a rule of equity, each case calls for an identification, evaluation, and weighing of the equitable claims of the parties, in order to test the conclusions of the courts below "not so much upon the facts as determined by the trial court as upon the legal significance of [those] facts * * * specifically in terms of knowledge of fault as a constituent element of the discovery rule."

[*Vispisiano v. Ashland Chem. Co.,* 107 *N.J.* 416, 428, 527 *A.*2d 66 (1987) (citations omitted) (alteration in original).]

In *Vispisiano* we emphasized the importance of evaluating "the nature of the injury and the difficulty inherent in discovering certain types of injuries." *Ibid.* Importantly, although it is basi-

cally a factual inquiry, "[t]he decision requires more than a single factual determination [and] it should be made * * * with a conscious[ness] of the equitable nature of the issue." *Ibid.* (citing and quoting *Lynch v. Rubacky*, 85 *N.J.* 65, 73–74, 424 *A.*2d 1169 (1981) (internal quotation marks omitted)).

■ Among the many factors a court may consider in evaluating the reasonableness of plaintiff's claim are: the age at the time the sexual abuse occurred; any threats the wrongdoer may have made to plaintiff; the length of time that passed between the end of the abuse and the emergence of the injuries; the nature of the injuries; the difficulty in discovering certain injuries; and whether the delay may "have peculiarly or unusually prejudiced the defendant." *Lopez, supra,* 62 *N.J.* at 276, 300 *A.*2d 563; *see also Doe v. Creighton*, 439 *Mass.* 281, 786 *N.E.*2d 1211, 1214 (2003).

Under the Act, sexual abuse is defined as "an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult." *N.J.S.A.* 2A:61B–1a(1). Because the cause of action is meant solely for victims of child sexual abuse, we believe the Legislature intended for the objective standard of reasonableness upon discovering the connection between the abuse and his or her injuries to refer to a reasonable person who has been subjected to sexual abuse as a child. Thus, we hold that a trial court must determine, based on the totality of the circumstances, when the injured party in fact discovered, or when a reasonable person subjected to child sexual abuse should have discovered, that the claimed injury was causally related to the asserted child abuse by the defendant. The trial court should then use the earlier of those two dates as the date the cause of action accrued under the Act.

■ The burden of proof is on the party claiming the indulgence of the Act's discovery rule and, if necessary, its tolling provision. *Lopez, supra,* 62 *N.J.* at 276, 300 *A.*2d 563. In the typical case, the plaintiff may attempt to prove the objective reasonableness of his or her failure to connect the link between the abuse and the injuries through expert testimony. In other similar contexts, we

have considered expert testimony that child sexual abuse victims may react in certain ways. *See State v. P.H.*, 178 *N.J.* 378, 395, 840 *A*.2d 808 (2004) (noting that expert testimony on Child Sexual Abuse Accommodation Syndrome available to explain "why many sexually abused children delay in reporting their abuse, or later recant allegations of abuse"). That and other similar expert testimony will aid the court in its task.

Once the court determines the date the cause of action accrued, if the complaint was filed more than two years after that date, it must consider the tolling provision of the Act. The Act expressly provides that the running of the statute of limitations may be tolled because of the "plaintiff's mental state, duress by the defendant, or any other equitable grounds." *N.J.S.A.* 2A:61B–1c.

The statute does not define the three bases for tolling, but it is apparent that the test for each is highly subjective. After all, the Legislature granted victims great flexibility in presenting evidence to justify the application of tolling. In this regard, the Act expressly provides that at "the plenary hearing the court shall hear all credible evidence and the Rules of Evidence shall not apply, except for Rule 403 or a valid claim of privilege." *Ibid.*

Unhampered by the *Rules of Evidence*, plaintiff may present a full array of credible evidence to assist the court in its determination. That evidence may include empirical evidence as well as testimony from experts. For example, some advocate that a child subjected to incestuous abuse by a father or close male relative may suffer from Post–Traumatic Stress Disorder symptoms such as avoidance and denial, similar to those suffered by war veterans. That is, the victim may understand that he or she has psychological problems, but the syndrome impedes the recognition of the nature and extent of the injuries suffered, either because the victim has completely repressed memory of the abuse or because the memories are too painful to confront directly. *See* Anderson B. Rowan & David W. Fay, *Post–Traumatic Stress Disorder in Child Sexual Abuse Survivors: A Literature Review*, 6 *J. of Traumatic Stress* 3 (1993); Mary L. Paine & David J. Hansen,

*Factors Influencing Child to Self–Disclose Sexual Abuse,* 22 *Clinical Psychology Rev.* 271–95 (2001); *see also* David M. Fergusson & Paul E. Mullen, *Childhood Sexual Abuse: An Evidence Based Perspective* 67 (1999); David M. Fergusson & Paul E. Mullen, *Childhood Sexual Abuse and Psychiatric Disorder in Young Adulthood,* 35 *J. of Am. Acad. of Child & Adolescent Psychiatry* 1355–64 (1996); Jody Messler Davies & Mary Gail Frawley, *Treating the Adult Survivor of Childhood Sexual Abuse: A Psychoanalytic Perspective* 62–85 (1994).

An expert may also offer the opinion that plaintiff's inability to connect the abuse and his injuries was related to the individual characteristics of plaintiff. Although plaintiff's individual characteristics may not be considered in determining when a reasonable person subjected to child abuse should have discovered the connection between the abuse and the injuries in determining the accrual date of the cause of action, those characteristics are clearly relevant in the tolling analysis.

IV.

A.

■ We turn now to apply the above principles to this case. Obviously, neither the trial court nor the Appellate Division had the benefit of the test we now require.

Preliminarily, we note that the date on which the cause of action accrued was not found conclusively by the trial court. At one point the court appeared to refer to the "flashback" in October 1999 as the key date, but later the court referred to late 2001 and the conversation between plaintiff and his co-worker as the date the action accrued. We discuss each of those time periods.

As noted, the evidence showed that the "flashback" incident occurred in October 1999. We agree that the events surrounding plaintiff's "flashback" might possibly have provided a reasonable plaintiff subjected to child abuse with a sufficient incentive to seek out information regarding his or her injury or condition and its cause. Coupled with the comments of plaintiff's mother around

that time and plaintiff's later undated memo in which he mentioned that the event with his girlfriend brought repressed memories to light, the fact-finder might reasonably conclude that plaintiff either connected, or reasonably should have connected, his injuries to defendant's conduct at that time.

On the other hand, a contrary conclusion also may be reasonable. Indeed, the abuse occurred when plaintiff was relatively young, and a reasonable child victim might believe his or her psychological conditions were always present and therefore would not connect them with the abuse. *See Jones v. Jones*, 242 *N.J.Super.* 195, 205–06, 576 *A.*2d 316 (App.Div.1990) (noting multiple studies demonstrate that "long after the cycle of abuse itself has been broken, the victim will repress and deny, even to himself or herself, what has happened"). Further, the evidence showed that plaintiff continued to have sexual relations with his girlfriend and that he suffered no other flashbacks. Plaintiff testified that the sexual encounters with defendant made him feel special and that he was deeply ambivalent about the abuse. Surely, expert testimony on this issue would be useful to assist the fact-finder. In fact, at the *Lopez* hearing the expert witnesses could not agree whether the flashback was sufficient for plaintiff to connect the abuse and his injuries.

The second time period for the possible accrual of the cause of action as expressed by the trial court was the time of plaintiff's conversation with his co-worker in February 2002. The trial court disagreed with plaintiff's evidence that the conversation occurred in late February 2002 and, based on Dr. Durka's testimony, concluded that the conversation with the co-worker occurred in late 2001 or early 2002.

We are satisfied that the record does not support the trial court's finding that plaintiff's conversation with the co-worker and his preparation of the two memoranda occurred prior to February 2002. *See generally State v. Elders*, 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007) (explaining that "trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'"). As noted, the

court based its conclusion on Dr. Durka's vague recollection that plaintiff's conversation with the co-worker occurred in late 2001 or early 2002. However, the clear testimony of plaintiff and the co-worker supported the late February 2002 date, and Dr. Durka's comment that he believed the conversation occurred "towards the end of 2001 or the beginning of 2002" did not contradict that testimony. In short, the trial court's finding that the conversation took place in late 2001 was clearly mistaken and simply wide of the mark.

In any event, a remand is necessary for the trial court to consider the totality of the evidence in light of the standard we set forth today. It is not clear from this record when a reasonable victim in circumstances similar to plaintiff's would have made the necessary connection between plaintiff's condition and defendant's conduct. Nevertheless, we are satisfied that the conversation plaintiff had with his co-worker involved an explicit discussion of the connection between plaintiff's abuse and his injuries. Plaintiff may not have recognized the depth or the extent of his injuries until resuming psychological counseling, but the evidence established that, following the conversation with the co-worker, plaintiff linked his psychological condition to defendant's conduct. Additionally, shortly after that conversation took place plaintiff penned two memos demonstrating that he made the necessary connection. Assuming, without deciding, that plaintiff's cause of action did not accrue in October 1999, we find that the date of the conversation with the co-worker is the outside date for the accrual of the cause of action. Consequently, we disagree with the Appellate Division's conclusion that the cause of action did not accrue until the ensuing treatment with Dr. Durka.

### B.

Even if the evidence were sufficient to conclude that plaintiff's cause of action accrued prior to February 2002, the court failed to fairly evaluate plaintiff's evidence on tolling. Plaintiff claimed that the statute should be tolled because of his crippled mental state. Before the Appellate Division, plaintiff

maintained that the trial court erred in its tolling analysis because it confused tolling with accrual and did not conduct an analysis of his mental state or any other equitable ground, instead limiting its analysis to duress or physical impairment. Because the Appellate Division concluded that plaintiff's cause of action accrued after February 2002, the panel did not reach the tolling issue.

We agree that the trial court did not thoroughly examine the evidence in concluding that the tolling provision did not apply. The court apparently found that the testimony of the experts was of limited help and pointed out that plaintiff never repressed the memory of his abuse. That analysis did not go far enough.

If plaintiff's cause of action accrued on any date prior to February 14, 2002, the issue is whether plaintiff's mental state or any other equitable basis provided a sufficient reason for tolling the statute of limitations. The same evidence that plaintiff offered to establish the accrual date may be used in plaintiff's effort to show that the action should be tolled until at least February 14, 2002.

Under the Act, the tolling analysis is subjective and includes a review of plaintiff's individual characteristics that made him uniquely vulnerable: his sexual naiveté at the time of the abuse, his deeply ambivalent feelings about the abuse that made him feel special, and his desire to engage in additional sexual encounters with defendant. Although the experts may have differed in their ultimate conclusions, each expert recognized that plaintiff suffered from depression. It is for the trial court to determine whether the totality of plaintiff's evidence supports his position that his mental state was such that the statute of limitations should be tolled. In short, a complete re-examination of the evidence is necessary, recognizing that plaintiff need not comply with the *Rules of Evidence* in presenting relevant evidence in support of his tolling arguments.

## C.

We note one additional point. Although plaintiff also asserted tolling of the statute of limitations based on duress, there was

little evidence to support that claim. Plaintiff identified the comment by defendant at the time of the abuse that he should not tell anyone what they did as evidence of duress, but he presented no other evidence on that issue.

We have not explored the issue of duress in this context, but other jurisdictions generally require more than a single threat at the time of the abuse. *See generally Rakes v. United States,* 442 *F.*3d 7, 26 (1st Cir.2006) (noting that plaintiff must show that duress was continuous before tolling available); *Overall v. Estate of Klotz,* 52 *F.*3d 398, 405 (2d Cir.1995) (noting that plaintiff must "demonstrate some threats or abuse during the limitations period" for duress tolling to be appropriate); *Lloyd One Star v. Sisters of St. Francis, Denver, Colorado,* 752 *N.W.*2d 668, 683 (S.D.2008) (noting that plaintiffs failed to suggest "alleged duress continued from the time they were students until they filed this suit"). Although we need not decide the scope of the duress defense, plaintiff's claim of duress fails because there was no evidence that defendant made any threats to him beyond the single comment during the time of the abuse. That simply is not enough.

## IV.

We reverse the judgment of the Appellate Division and remand for a hearing in the Law Division consistent with the views expressed herein. A remand is necessary for the trial court to consider anew the totality of the evidence in light of the standards for determining the accrual date and if necessary, whether the statute of limitations should be tolled. Because the trial court previously made credibility findings, we deem it appropriate that the matter be assigned to a different trial court.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.