# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5021-17T2

D.S.,

    Plaintiff-Appellant,

v.

J.S.,

    Defendant-Respondent.

_____

Submitted January 6, 2020 – Decided January 14, 2021

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FV-19-0219-18.

John V. McDermott, Jr., attorney for appellant.

Laemers Murphy & Neggia, LLC, attorneys for respondent (Peter J. Laemers, of counsel and on the brief; Mariann C. Murphy and Doreen J. Neggia, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Plaintiff D.S. (Doris), appeals from the trial court's order dismissing her domestic violence complaint against her husband J.S. (John), and denying her a final restraining order under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1]  Doris principally contends the court mistakenly barred crucial evidence, undervalued other evidence, and erred when it concluded that, as a matter of law, John did not commit a predicate act of assault, N.J.S.A. 2C:25-19; N.J.S.A. 2C:12-1.  She contends the court's legal conclusion was at odds with its own factual finding that, during a tussle over a cellphone, John grabbed Doris by her hair and pushed her head against the steering wheel of the car she was driving.  We are constrained to remand, as we are convinced the court overlooked evidence of her injuries, and failed to explain its conclusion that John did not assault Doris, or, if he did, Doris did not need the protection of a final restraining order (FRO).

I.

The alleged assault occurred while Doris and John were on their way home from a pre-Thanksgiving Day gathering with friends.  Married less than a year, and parents of a three-week-old daughter, they had been having marital

---

[1]  We use initials and pseudonyms to protect the privacy of the alleged victim of domestic violence.  R. 1:38-3(d)(10).

difficulties.  Each blamed the other for the discord.  Doris was driving and had just turned onto the parties' street.  The two were arguing and John started recording Doris with his cellphone.  What happened next was a major point of dispute in the trial.

The court heard three versions.  According to Doris, John was intoxicated from drinking a bottle of bourbon at the party.  After she slapped John's phone out of his hand, he grabbed Doris by the neck, pulled her toward him, so her body was across the center console, and her head was in his lap in the front passenger seat.  She said he put the car in park from the passenger seat, and strangled her to the point she felt her neck crack, her vision became "snowy," and she gasped for air.  He then exited and walked around the car to Doris.  He pulled her out by her hair and dragged her along the road.  He threatened to kill her.  They were "rolling around, like two children would roll down like a grass hill."  He bashed the right side of her head on the pavement while the right side of her body leaned against the lip of the roadway.  John then returned to the car, and backed it up so close she thought he was going to run over her.  He then got out, grabbed her by the hair again, and led her stumbling to the car.  He threw her into the back seat.  Before he could drive off, she escaped.  She ran to a nearby public works building.

3

She called John's father F.S. (Fred), who, with his wife, had been babysitting the parties' daughter. She told him that John just tried to kill her. He came to pick her up. Doris contended that on the way to her in-laws, she overheard John call Fred on the Bluetooth and say, "Dad bring [Doris] home. I'm going to kill her. I'm going to lose my job." John was a sergeant in the local police department. Fred ignored the request and took Doris to his own house. Doris said that when she arrived, she collapsed on the living room floor, convulsing and hyperventilating. She went to the bathroom, to wash her scraped hands, tidy her hair, and "wipe[] off some of the makeup from crying." After hearing John arrive, she then took refuge in a bedroom alone.

John told a different story. He said he had only three drinks during a six-hour period. Once he started recording the argument, Doris threw the car in park, and then grabbed his phone from his hand, and hit him with it. He reached across the center console and grabbed his phone back from her hands. He denied scratching or hitting her, although when he was confronted with a prior statement, which he did not recall making, he acknowledged that he may have scratched her as he retrieved his phone.[2] Doris then left the car. John sat in the

---

[2] Doris testified that John scratched her as he reached into her shirt to grab her cellphone, which she tucked in her bra.

car for a few moments, then stepped over the console into the driver's seat and drove home, which was a short distance away. Fred called John, not the other way around, to tell him that Doris was at his house, and she accused him of assault. John went to his father's house, distraught that her false accusation would interfere with his access to his daughter.

There was yet a third version of what happened in the car that night. It was one John's fellow sergeant reported he heard from John himself. Once John arrived at the deck of his parents' house, John hurled and broke the plastic deck furniture and made a commotion. John testified he was upset because his father told him that Doris was threatening to take their daughter.

Shortly afterward, the local police chief and the sergeant arrived. Fred had called the chief on his personal phone to ask him to come talk to his son. The sergeant was dispatched after someone called 911 with a report that someone had fallen off a deck, and there were "possible gunshots" heard. The sergeant overheard John cursing and crying, and saw the plastic debris. Dressed in plain clothes, the chief approached John on the deck and put his hand on his shoulder, in an effort to encourage him to calm down. John quickly turned and pushed the chief, knocking him to the ground. The sergeant then handcuffed

5

John and took him into the house. John said his chief had not announced his presence, and John did not know who was grabbing his arm.

John was placed in a bedroom, accompanied by a patrolman. Once John calmed down, the chief told the sergeant to remove the handcuffs. Despite orders to remain in the bedroom, John pushed the patrolman in an effort to exit. The patrolman tackled John and subdued him.

According to the sergeant's written report and his trial testimony, John appeared intoxicated at his father's house. John told the sergeant what happened in the car earlier that night. The sergeant reported that once John began recording his argument with Doris, she slapped his hand repeatedly, grabbed his phone, and hit him twice on the arm. The sergeant wrote, "[W]hile attempting to get his phone back and get [Doris] off of him he grabbed [Doris] by her hair and pushed her head against the steering wheel of the vehicle." The sergeant wrote that John displayed no observable signs of injury.

However, both parties refuted the version the sergeant attributed to John. John said his fellow sergeant misunderstood him; he was simply repeating what Doris had said, according to Fred. Doris also denied that John grabbed her head and pushed it against the steering wheel.

A-5021-17T2

The sergeant and chief both testified that Doris's demeanor and physical appearance in the aftermath of the incident did not reflect she was a victim of the violent assault she described. They inspected her hair and found no debris or signs of injury on her scalp. The chief observed some redness on her chest and a barely visible scratch on her neck. The chief told Doris to report to police headquarters if marks became more prominent, as they sometimes do with time, so the police could document them. Officers then checked on Doris, who had gone to the marital home to retrieve clothing and other items for her and the baby. When the sergeant arrived and saw Doris, he noted more distinct scratch marks on her neck and upper chest. He advised her to come to the police station, so her injuries could be documented. An assistant prosecutor, advised of the situation, directed that John be charged with simple assault. He was arrested shortly afterwards.

The next day, caseworkers from the Division of Child Protection and Permanency (DCPP) visited Doris at her parents' home, where she relocated with the baby. The caseworker's discussion prompted her to file a domestic violence complaint and seek a temporary restraining order (TRO), which she obtained that afternoon. Doris later filed two amendments of her complaint.

Doris alleged three other instances of domestic violence in the weeks preceding the assault. John called Doris derogatory names; he allegedly threatened to strangle her; and he pushed his foot into Doris's lower stomach where she recently had a C-section, to block Doris from taking their child out of his hands. She also claimed that John harassed her by sending her multiple texts the morning after the incident, before she obtained the TRO. John admitted calling Doris one name, but not the others. He denied threatening to strangle her. And he said he only raised his foot to block Doris; she walked into it, and then falsely accused him of kicking her. He admitted sending the texts, but denied they were harassing.

## II.

The trial judge found the chief and sergeant were credible. John was partly credible; and Doris was not credible. In rejecting Doris's version of events, the court relied on circumstantial evidence that belied Doris's claims, as well as numerous inconsistent statements.

As depicted in videos and photographs taken as she entered and left Fred's house and at the police station, Doris's clothing — her white pants, soft suede jacket, and soft leather boots — showed no signs that she was dragged along a rough roadway, or that she rolled around on the ground. She walked and turned

her head normally during the minutes and hours after the allegedly vicious attack. Although the chief noticed some redness on Doris's upper chest and a barely visible scratch mark that later became more prominent, the police found no petechiae or redness in her head; there was no debris in her hair; and her breathing, speaking and demeanor appeared normal. The court also concluded that the attack Doris described and her flight to the public building, which John said was 900 feet away, would have taken more time than the three minutes between when John's cellphone ceased recording, and Doris called Fred.

The court also found that Doris's allegation was unsupported by "the medical evidence which found no objective signs of injury." We address that last finding in depth below.

The court also cited Doris's inconsistent statements. Video of Doris's jacket immediately after the incident belied her testimony that a belt loop of her jacket, which she brought to court, was torn in the altercation. The chief's and the sergeant's testimony, and her own initials on the victim's rights notification form, belied her claim that the chief and sergeant failed to explain her right to seek a restraining order under the PDVA. In her written statement the night of the incident, she claimed John dragged her fifty to seventy-five feet from and

then back to the car, yet at trial, she said it may have been only ten to fifteen feet.

The court found that John was partly credible. The court rejected John's claim he was not intoxicated. His conduct at his father's house demonstrated otherwise. The court also found incredible his claim that the sergeant misunderstood his statement, and that he was merely repeating what his father reported to him when he referred to grabbing Doris by her hair and pushing her head into the steering wheel. The court found that the sergeant accurately reported that John admitted doing just that. The court found that the chief and sergeant were credible as to other matters, as well.

However, in other respects, the court credited John's version of events that night. The court rejected Doris's argument that John's "out of control conduct" at his father's house reflected his guilt of the assault she alleged. Rather, it reflected his "propensity to drink too much or behave in an out of control manner when intoxicated and upset." The court also credited John's statement that he was recording Doris to protect himself against a potential false claim of impropriety or domestic violence. The court found that certain texts between the parties justified John's concern, including a text that John sent to Doris stating that she had begged him to hit her and that was "crazy."

10

The court also credited John's version of the prior incident in which Doris came in contact with his foot while attempting to take the baby from his arms. While acknowledging his mother's potential bias, the court noted that L.S. (John's mother) corroborated John's account.[3]

The court found that Doris's redness and scratches were not caused by the "violent struggle and choking event" she described. Based on its credibility findings, the court rejected Doris's claim that John committed the predicate act of a terroristic threat to kill, during the incident in and near the car. The court also concluded there was no prior or subsequent act of domestic violence. As noted, the court rejected Doris's claim that John purposely kicked her in the stomach. The court also found that his prior and subsequent communications, including some coarse language and threats to end their relationship, did not constitute harassment or terroristic threats.

Turning to its ultimate legal conclusions, the court held, "taking as true defendant's admission" that he grabbed Doris by the hair and pushed her head against the steering wheel, defendant's admitted acts did not constitute a

---

[3] The court did not mention another reason for rejecting Doris's claim. In her testimony in support of the TRO, the judge asked if there had been any "prior domestic violence," and she said "never," adding that the assault in and near the car was "very unexpected."

A-5021-17T2

predicate offense of assault. The court added that even if John committed an assault, Doris did not need an FRO for protection.

This appeal followed. Doris presents the following points for our consideration:

POINT I:

THE TRIAL COURT COMMITTED CRITICAL FACTUAL AND LEGAL ERRORS REGARDING THE ASSAULT THAT PRODUCED AN INCORRECT AND UNJUST RESULT THAT COMPELS REVERSAL BY THIS COURT. (Raised Below).

A.   Bodily Injury. (Raised Below).

B.   Adverse Inferences. (Raised Below).

C.   Admissions Against Interest. (Raised Below).

POINT II:

THE COURT BELOW ABUSED ITS DISCRETION AND CAUSED AN UNJUST RESULT BY ADMITTING THE SECURITY CAMERA VIDEOTAPE INTO EVIDENCE AFTER DEFENDANT CAUSED PORTIONS OF IT BENEFICIAL TO THE PLAINTIFF TO DISAPPEAR. (Raised Below).

POINT III:

THE OVERWHELMING NUMBER OF EVIDENTIARY ERRORS BELOW CONSTITUTED

12

A CLEAR ABUSE OF DI[S]CRETION, INDIVIDUALLY AND COLLECTIVELY, THAT RESULTED IN A MANIFEST DENIAL OF JUSTICE TO THE PLAINTIFF THAT COMPELS REVERSAL AND REMAND. (Raised Below).

    A.    Admission of videotape from [Fred's] security camera. (Raised Below).

    B.    Unemployment Fraud. (Raised Below).

    C.    Report to D.C.P.P. (Raised Below).

    D.    [Doris's] Diary. (Raised Below).

    E.    Reports of Chief [of Police]. (Raised Below).

    F.    Unreliable Evidence of Time Related to the Assault was used by the Trial Court to Discredit Plaintiff and Conclude Her Testimony was not Credible and the Assault could not have Occurred. (Not raised below).

POINT IV:

THE TRIAL JUDGE'S CONCLUSIONS WERE SO FAR WIDE OF THE MARK THEY REQUIRE REASSESSMENT BY THIS COURT BECAUSE HE IGNORED DEFENDANT'S HIGHLY INTOXICATED CONDITION, VIOLENT DESTRUCTION OF FURNITURE, AND ASSAULTIVE BEHAVIOR AGAINST TWO FELLOW POLICE OFFICERS, WHILE DEFENDANT CONTINUED HIS ATTEMPTS TO ASSAULT HIS WIFE. (Raised Below).

13

POINT V:

THE POLICE OFFICERS WHO INVESTIGATED THIS DOMESTIC VIOLENCE WERE LONG TIME FRIENDS AND COLLEAGUES OF DEFENDANT AND THEIR PARTISAN ACTIONS AND OMISSIONS WERE FLAGRANTLY OVERLOOKED BY THE TRIAL JUDGE WHOSE FACTUAL DETERMINATIONS WENT SO FAR AWRY BECAUSE OF THIS THAT HIS SERIOUSLY FLAWED CONCLUSIONS REQUIRE RECONSIDERATION, REVERSAL AND REMAND TO CORRECT THIS INJUSTICE.  (Raised Below).

POINT VI:

THERE WAS NO CREDIBLE EVIDENCE BELOW WHICH THE TRIAL COURT COULD FACTUALLY AND LEGALLY RELY UPON TO CONCLUDE DEFENDANT DID NOT MAKE TERRORISTIC THREATS TO HIS WIFE AND THIS COURT MUST CORRECT THOSE ERRONEOUS DETERMINATIONS THAT DENIED JUSTICE TO THE PLAINTIFF.  (Raised Below).

III.

We generally defer to the Family Part's fact-finding in a domestic violence case, because of the court's expertise and training, J.D. v. M.D.F., 207 N.J. 458, 482 (2011); and because of the court's feel of the case, and its opportunity to assess the demeanor of live witnesses, see Cesare v. Cesare, 154 N.J. 394, 412 (1998).  In general, a trial court's "findings . . . are binding on appeal when supported by adequate, substantial, credible evidence."  Id. at 411-12.  Yet, an

14

appellate court may disturb a trial court's fact-findings that rest on an "obvious overlooking or under-evaluation of crucial evidence." State v. Johnson, 42 N.J. 146, 161-63 (1964). That is true here, because the court mischaracterized significant medical evidence of Doris's injuries.

We also owe no deference to the trial judge's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). When John pulled Doris by the hair and pushed her head into the steering wheel, he committed an assault, see N.J.S.A. 2C:12-1(a), unless he was justified by self-defense, see N.J.S.A. 2C:3-4, or protection of property, see N.J.S.A. 2C:3-6(c). Although the trial court found no assault, it did not address the elements of either affirmative defense. The court also held an FRO was unneeded even if there were an assault, but failed to address the factors essential to that finding. See Silver v. Silver, 387 N.J. Super. 112, 127 (App. Div. 2006) (discussing the factors). We are constrained to remand when a trial court does not "state clearly its factual findings and correlate them with the relevant legal conclusions." Curtis v. Finneran, 83 N.J. 563, 570 (1980); see also Elrom v. Elrom, 439 N.J. Super. 424, 443 (App. Div. 2015).

A.

We turn first to the trial court's "overlooking or under-evaluation of crucial evidence." A critical element in the court's reasoning was its finding that Doris displayed only minor injuries. Immediately after the alleged assault, Doris displayed only redness and a barely visible scratch. The court questioned "how plaintiff's neck became so scratched as depicted" in photographs in evidence, "as the police did not notice anything other than general redness and," as the sergeant reported, "'a barely visible scratch on plaintiff's neck when plaintiff was at [Fred's] house.'"

The court also relied on its understanding of the medical evidence presented at trial. The court stated it could not "reconcile the lack . . . of any objective and substantiated medical proof of injury with the violence that plaintiff was alleged . . . to have been subjected to during the . . . struggle." In addition to relying on the chief's and sergeant's testimony that they observed few signs of injury shortly after the incident, the court heard from a physician's assistant (PA) who examined Doris at a nearby hospital thirty-six hours after the alleged assault. Doris testified that she sought medical attention because she continued to experience pain and headaches.

16

The court found that the PA was credible, and that Doris's allegations were at odds with "the medical evidence which found no objective signs of injury." The court stated, "It is not believable that the scratches on plaintiff's neck were anything more than superficial insofar as there were no signs of them only two days later at the hospital. It was further confirmed by the credible testimony of . . . the Physician's Assistant." The court reviewed the PA's negative findings. There were no signs of petechiae, which sometimes results from strangulation, although the PA said that petechiae would not follow blockage of the carotid artery. The PA observed no hematoma, which might result from being dragged by one's hair. There was no misalignment of the neck. And the CAT scan was negative. According to the PA, it did not disclose "acute post-traumatic changes."

However, the court significantly mischaracterized the PA's testimony in finding that there was no other "objective and substantiated medical proof of injury." The court erred in stating that the PA "testified that there [were] no . . . abrasions." The PA actually testified that Doris had abrasions, as well as redness on her neck. More significantly, the PA testified that Doris had swelling on her head, and other parts of her body. The PA testified,

> But in the back of her head, the parieto-occipital area, she had swelling and pain to palpation, but no open

skin.  And on the same side of her trunk, same thing, she had swelling and pain to palpation.  She had abrasions and [e]rythema and swelling, which is redness on the front of her neck.  And tenderness throughout her neck.[4]

Based on her objective findings, as well as Doris's subjective complaints, the PA stated that Doris had a "contusion, closed-head injury, cervical strain, abrasions" and she suffered an "assault by manual strangulation" and "strain of thoracic region."  The court may have discounted that diagnosis, because the court questioned Doris's veracity in describing her subjective symptoms and the events that caused them.  But, the court also overlooked the objective findings that did not depend on Doris's veracity.

We conclude that the court "overlooked or under-evaluated" the testimony, by finding that there was no objective medical evidence of injury. We also conclude that the PA's evidence was "crucial," because the court expressly relied on the medical evidence, as the court understood it.

We recognize that the trial court weighed heavily Doris's inconsistent statements, her post-incident demeanor, the state of her clothing, and the timeline of events that the court deemed inconsistent with the attack Doris

---

[4]  We acknowledge that tenderness and expressions of pain are subjective manifestations of injury.  We focus here on objective indicators the court overlooked, such as swelling, abrasions and erythema.

described. We may not weigh those facts anew, or second guess the court's determination that those facts undermined her credibility. See Johnson, 42 N.J. at 161.

Nonetheless, had the court noted the objective medical evidence the PA presented of swelling at the bottom of the head, on the front of the neck, and on the right side of the body, along with redness and abrasions of the neck, the court may have been persuaded that the altercation was more serious than John admitted to the sergeant, even if it did not rise to the level Doris described. And, a revised finding about the nature of the physical interaction may have affected the court's finding that John's out-of-control behavior at his father's house reflected only intoxication and impulsivity, and not a consciousness of guilt. A revised finding regarding Doris's injury may also have affected the court's determination that Doris did not need an FRO for protection. For that reason, we conclude the court's error was clearly capable of producing an unjust result. See R. 2:10-2. Therefore, we are constrained to vacate the trial court's judgment.

## B.

We also consider the court's legal conclusion that John's admitted conduct did not constitute an assault; and even if it did, that an FRO was unneeded.

In deciding whether to grant a final restraining order, a trial court must engage in a two-step inquiry. Silver, 387 N.J. Super. at 125. The court must first determine whether the plaintiff proved, "by a preponderance of the credible evidence," that the defendant committed a predicate act listed in the PDVA. Ibid. One such predicate act is assault. N.J.S.A. 2C:25-19(a)(2). If the court finds that the defendant committed a predicate act, the court must decide whether to issue a restraining order. Silver, 387 N.J. Super. at 127. The court will issue a restraining order if one is necessary to protect a victim from further abuse. Ibid.

The court's legal conclusions regarding the two prongs lacked adequate reasoning, and in the case of the first prong, may have rested on a mistake of law. Absent legal justification, there should be no debate that the purposeful act of grabbing a person by the hair and pushing the person's head into a steering wheel constitutes an assault. The two acts doubtlessly cause "physical pain" and, therefore, "bodily injury." See N.J.S.A. 2C:12-1(a)(1) (defining simple assault to include purposefully causing "bodily injury to another"); and N.J.S.A. 2C:11-1(a) (stating "'bodily injury' means physical pain"). Along with proof of purposeful conduct and causation, that is all the law requires. See Capell v. Capell, 358 N.J. Super. 107, 111 (App. Div. 2003) (holding that evidence that a

husband shoved his wife into the bathroom counter during an argument was sufficient to establish simple assault).

In concluding that John did not commit assault, the court evidently relied on three considerations: the parties' "pushing and slapping" was "mutual"; John wanted Doris "off of him"; and John wanted his phone back. The court stated:

> Under these circumstances, which this [c]ourt finds to be a mutual engagement of pushing and slapping over control of defendant's cell phone, the [c]ourt does not find that defendant's acknowledged action of grabbing plaintiff by her hair and pushing her head against the steering wheel in an effort to get his phone back and get plaintiff off of him constitutes assault.

After John provoked Doris by recording, and Doris provoked John by grabbing his phone, the court suggests the two entered a fight by mutual consent, by finding a "mutual engagement of pushing and slapping." However, a "fight or scuffle entered into by mutual consent" is still assault, although it is graded as a petty disorderly persons offense. N.J.S.A. 2C:12-1(a).

Alternatively, the court suggested that John acted in self-defense, to "get plaintiff off of him," and acted in defense of his property, to "get his phone back." However, the court made no express finding that John "reasonably believe[d]" that the amount of force he used was "immediately necessary for the purpose of protecting himself against the use of unlawful force" by his wife.

N.J.S.A. 2C:3-4(a). John thus must have believed he needed to grab his wife's hair and push her head into a steering wheel to protect himself. In his intoxicated state, he may well have done so.

But that is not enough. He was obliged to prove that such a belief was reasonable, notwithstanding that he evidently could have protected himself by just leaving the car. See State v. Kelly, 97 N.J. 178, 198-99 (1984) (stating that a person must have both a subjectively honest belief, and an objectively reasonable belief, that the use of force was necessary). Absent essential trial court findings, we shall not conclude that John's assault was justified by self-defense.

For the same reasons, we do not conclude his assault was justified by his desire to protect his personal property, his cellphone. See N.J.S.A. 2C:3-6(c). To establish that affirmative defense, the court was required to find that John "reasonably believe[d]" that the force used was necessary to prevent what John "reasonably believe[d]" was his wife's attempt to "commit theft, criminal mischief or other criminal interference with [his] personal property." Ibid. Even if John could prove that he reasonably believed he needed to grab her hair and shove her face into the steering wheel to enable him to retrieve his phone, it is

doubtful he honestly and reasonably believed Doris's temporary seizure of his phone constituted a crime.

In the alternative, the court found that even if Doris proved a predicate act, she failed to prove she needed an FRO.

> Even if the [c]ourt were to conclude that defendant's action of grabbing plaintiff by her hair and pushing her head against the steering wheel in the process of getting plaintiff off of him constitutes assault and recognizing that even one incident of assault can support the issuance of a final restraining order, under the facts of this case and noting the absence of any substantiated prior history of domestic violence, this [c]ourt would not find assault or that prong two of Silver would have been satisfied by defendant's admission . . . .

The court cited R.G. v. R.G., 449 N.J. Super. 208 (App. Div. 2017) for the proposition that "a physical confrontation alone does not require the issuance of an FRO."

The court's analysis of the second prong of the Silver analysis fell short. Although the PDVA does not "automatically mandate[]" an FRO upon finding a predicate act, Kamen v. Egan, 322 N.J. Super. 222, 227 (App. Div. 1999), the second prong determination is "most often perfunctory and self-evident," Silver, 387 N.J. Super. at 127. "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29a(6), to protect the victim from an immediate danger or to prevent

23

further abuse." Ibid. The six factors include: (1) the previous history of domestic violence between the parties; (2) "[t]he existence of immediate danger to person or property;" (3) the financial circumstances of the parties; (4) "[t]he best interests of the victim"; (5) the protection of the victim's safety in relation to custody and parenting time; and (6) the existence of a restraining order in a different jurisdiction. N.J.S.A. 2C:25-29(a)(1) to (6). The list is not exclusive, N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015), and the court may consider other relevant factors, N.J.S.A. 2C:25-29(a) (stating the court "shall . . . not be limited" to the listed factors).

Here, the court considered only the absence of a previous history of domestic violence. The court did not address other factors, including John's propensity to drink and act out-of-control, as demonstrated by his actions against not only his wife, but his fellow police officers. We owe no deference to the court's second prong conclusion, as it lacked an evaluation of the relevant factors, and a statement of the court's reasoning. R. 1:7-4.

In sum, we are constrained to vacate the trial court's judgment because it rested on an "overlooking or under-evaluation of crucial evidence"; the finding that defendant did not commit a predicate act of assault lacked legal reasoning

and may have been based on a mistake of law; and the court's determination that Doris did not need an FRO's protection also lacked adequate reasons.

## C.

Doris's claims of evidentiary error warrant only brief comment. We will defer to the court's evidentiary decisions unless the court palpably abused its discretion, that is, its ruling was so misguided as to deny justice. See Grewal v. Greda, 463 N.J. Super. 489, 503 (App. Div. 2020). We discern no such abuse of discretion here.

Regarding the decision to admit into evidence video-recordings from Fred's home, the court reasonably credited Fred's testimony that he produced the only recordings that still existed. Also, the court's decision to allow defense counsel to cross-examine Doris about her obligation to repay wrongfully received unemployment benefits was of no consequence, because the court expressly disregarded the testimony in its decision.

The court also did not err in barring Doris's counsel from questioning the chief about his communications with DCPP, and denying her demand that he be provided a copy of the chief's reports, which he brought with him to trial. In both cases, Doris's counsel could have taken steps to secure those documents in advance of trial, but did not. Doris's counsel could have filed an appropriate

motion before trial under N.J.S.A. 9:6-8.10a(a), upon notice to the Division, that he sought disclosure of communications that are generally confidential. Likewise, counsel could have served a subpoena on the chief for his reports. Although discovery is limited in the usual summary trial of a domestic violence complaint, the trial in this case occurred months after the complaint; it continued over a three-month period; and the court allowed both sides to engage in limited pre-trial discovery. See Crespo v. Crespo, 408 N.J. Super. 25, 44-45 (App. Div. 2009) (recognizing a trial court's discretionary authority to permit "limited discovery . . . to prevent an injustice" in a domestic violence case).

The court also did not abuse its discretion in barring Doris from introducing into evidence her personal diary, to establish discord in the marriage. The court reasonably questioned its relevance and its trustworthiness.

To the extent not addressed, Doris's remaining points lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Finally, because the judge who decided this matter in the first instance made credibility determinations, we are constrained to direct that the remand be assigned to a different judge. See R.L. v. Voytac, 199 N.J. 285, 306 (2009). Judgment vacated and remanded. The TRO is reinstated. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5021-17T2