# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3995-23

K.V.,[1]

    Plaintiff-Appellant,

v.

K.A.S.,

    Defendant-Respondent.

_____

Argued March 11, 2025 – Decided March 25, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-3221-24.

John Pendergast argued the cause for appellant (South Jersey Legal Services, Inc., attorneys; John Pendergast, Cheryl Turk Waraas, and Kenneth M. Goldman, on the brief).

Tess A. Berkowitz argued the cause for respondent (Law Office of Christopher St. John, attorneys;

---

[1] We use initials to protect the confidentiality of the parties. R. 1:38-3(c)(12).

Christopher St. John, of counsel and on the brief; Tess A. Berkowitz, on the brief).

PER CURIAM

Plaintiff K.V. appeals from an August 6, 2024 order dismissing her application for a final restraining order (FRO) against her former paramour, defendant K.A.S., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  The judge found that plaintiff established the predicate act of assault under prong one of Silver,[2] but she had failed to demonstrate an FRO was required because she was not in immediate danger nor was the FRO necessary to prevent further abuse under prong two.

Because the judge did not make the requisite findings and did not apply the two-prong test in Silver, we reverse and remand for a new trial before a different judge.

I.

The parties dated for two months.  During that timeframe, defendant moved into plaintiff's apartment.  The alleged incident occurred on April 9, 2024.  One week prior, plaintiff underwent surgery on her right shoulder, and her right arm was in a sling.

---

[2] Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

According to plaintiff, on the day of the alleged incident, defendant became angry about her need for shoulder surgery and because she did not seek his permission to undergo the procedure. Plaintiff explained that her shoulder would fully dislocate "sporadically throughout [the] day." The argument began at approximately 10:30 p.m. and lasted forty-five minutes. Defendant "screamed" in plaintiff's face that she was "stupid." Defendant had been drinking heavily that day and consumed a half bottle of vodka. Plaintiff yelled at defendant to leave her alone, but he punched the doorway to their bedroom "four times." He approached plaintiff and yelled close to her face.

The argument escalated and became physical. Plaintiff alleged defendant pushed her to the floor on top of a box of perfumes, and she fell on top of her recently operated right shoulder. Plaintiff told defendant to get off of her, but instead, he kneeled on her legs using his right leg, wrapped his left arm around her throat in a choke hold, and then choked her. Plaintiff sustained extensive bruising on her legs. Plaintiff alleged she could not breathe and scratched defendant's left arm until he bled, to "[g]et [him] the f[**]k off of [her]," and tried to push herself up. Plaintiff estimated defendant weighed 182 pounds.

Plaintiff claimed defendant picked her up by the neck "still in a choke hold" and threw her on to the bed face down. After plaintiff grabbed, squeezed,

3 <span>A-3995-23</span>

and twisted defendant's genitals, he released her throat from the choke hold. Plaintiff left the bedroom, got her phone, and attempted to call 9-1-1, but defendant took the phone and "hung up" the call prior to the call connecting. Plaintiff stated that defendant stepped in between her and the door and would not allow her to leave or seek medical treatment. Plaintiff testified that defendant would not let her out of his sight for "roughly, nine days." The only time she left was to pay part of the rent.

Plaintiff mentioned to defendant that she was going to hang out with a friend and asked him if he was "okay with that." In response, defendant told plaintiff it was "stupid and childish for [her] to even tell him that." According to plaintiff, defendant said if he had any "inkling" that she was cheating on him, he would "shove" a gun "up the other guy's ass and shoot him and make [her] watch and then shoot [her]."

Eight days later, on April 17, 2024, plaintiff applied for and obtained a temporary restraining order (TRO) against defendant alleging the predicate acts of assault, terroristic threats, and "any other crime involving risk of death or serious bodily injury." The amended TRO alleged defendant committed "aggravated assault" by knowingly or recklessly "obstructing the breathing or blood circulation of [plaintiff]" and that he threatened to "kill" plaintiff

"specifically by telling [her] if she was cheating on him he would shoot her and the person she is cheating [with.]" Separately, defendant was charged with criminal aggravated assault the same day.

At the ensuing two-day trial, both parties were represented by counsel. Plaintiff testified that she waited eight days to obtain a TRO against defendant because she could not operate her manual transmission car and shift gears due to her right shoulder surgery. Plaintiff testified a friend had to drive her to the police station to apply for the TRO. The police photographed bruises on plaintiff's legs, which were moved into evidence.

The TRO granted defendant possession of plaintiff's apartment. Plaintiff testified she did not want to return to her apartment because she did not want defendant to know where she lived. Plaintiff stated that defendant mentioned that if she took any legal action against him, "he would physically harm . . . or kill" her. Plaintiff testified she would not feel safe without an FRO based on defendant's threat to harm or kill her after the assault had taken place.

On cross-examination, plaintiff testified that she worked with defendant until she obtained the TRO against him. Plaintiff stated she was evaluated by her surgeon the day after the assault and told the surgeon about the assault and that she felt unsafe at home. Plaintiff explained that defendant was concerned

A-3995-23

about finances and her vehicle being uninsured. Plaintiff acknowledged that prior to the April 9, 2024 incident, defendant had never placed his hands on her or threatened her.

Defense counsel showed plaintiff screenshots of text messages through Facebook messenger between her and her best friend stating, "we just got into a physical fight," and "[h]e tried to say I beat him up." The text messages were read to plaintiff stating, "[defendant] is tore up more than I am," and "[h]e put me in a choke hold." Plaintiff indicated she wanted to talk to her friend when they were alone. The friend offered to drive up to plaintiff. Plaintiff confirmed that her friend encouraged her to call the police and leave. Plaintiff testified that defendant had previously kicked her friend out of the apartment and threatened to "start stuff."

Nurse L.F.R. testified as an expert witness on behalf of plaintiff on strangulation and smothering. L.F.R. is a forensic nurse examiner who works with the Salem and Cumberland Counties' Prosecutors' Offices on the BREATHE[3] team, which responds to cases involving non-fatal strangulation.

---

[3] BREATHE is an acronym for "Breathing/Blood Flow Restriction Event: Advocacy, Treatment, Help, and Empowerment." Attorney General Law Enforcement Directive No. 2023-03 mandates that County Prosecutors create

L.F.R. testified that the BREATHE team is comprised of a forensic nurse, law enforcement, and an advocate. L.F.R. explained that BREATHE was established by Attorney General Law Enforcement Directive 2023-03, which became effective on August 21, 2023.

L.F.R. testified that she examined plaintiff on May 9, 2024, after receiving a call from the hospital that plaintiff qualified under the BREATHE protocol. During the examination, which occurred a month after the incident, plaintiff described to L.F.R. that defendant "came from behind" and "his arm was wrapped around" her neck as he "applied pressure." Plaintiff told L.F.R. that her head struck the bed.

L.F.R. testified that plaintiff informed her that she still experienced pain in her right shoulder, neck, and suffered from headaches after the assault. L.F.R. opined that it was not uncommon for such symptoms to persist a month or longer after a strangulation episode.

---

and enforce protocols for referring victims of nonfatal strangulation and smothering to forensic medical examinations. The Directive expands on existing initiatives in several counties that have already implemented specialized response teams for these cases. See AG Creates BREATHE Team for Crimes of Nonfatal Strangulation, Forensic Mag. (Aug. 24, 2023), https://www.forensicmag.com/602274-AG-Creates-BREATHE-Team-for-Crimes-of-Nonfatal-Strangulation/.

A-3995-23

On cross-examination, L.F.R. was questioned about plaintiff's shoulder surgery, mental health diagnoses, and medications. Defendant did not testify and did not call any witnesses or present any evidence.

In an oral opinion, the judge determined plaintiff was credible, in part, and had proven the predicate act of assault. The judge expressly found credible plaintiff's testimony that defendant had thrown her down to the floor, fell on top of her, placed her in a choke hold and choked her, resulting in a "physicality" that constituted simple assault. The judge determined that plaintiff did not prove the predicate act of terroristic threats and questioned her credibility on that issue. In his opinion, the judge noted plaintiff "seem[ed] to feel the need to kind of amp up the . . . proofs" on the terroristic threats issue.

The judge did not find an FRO was necessary to protect plaintiff under the second prong of Silver and based his findings on several facts. First, the judge placed great weight on the text messages introduced by defense counsel during plaintiff's cross-examination, which contained the series of communications with her friend after the assault. The judge emphasized that in one of the text messages, plaintiff stated she did not want to go to the police right away and was looking for more evidence. The judge rejected plaintiff's testimony that defendant prevented her from leaving the apartment to get help as not credible

8

based on plaintiff's own text messages, her decision to go to sleep, and not to have her friend come over.

The judge determined that plaintiff had "many opportunities" to contact the police sooner and did not seek help from law enforcement until defendant locked her out of the apartment. Based upon these findings, the judge found plaintiff "clearly" did not have concerns for her safety on the night of the assault. The judge also found significant the fact that plaintiff waited approximately one week before seeking a TRO.

In addition, the judge highlighted that the parties are now separated, plaintiff moved out of her apartment, and there was little likelihood they would have contact with each other in the future. Based on those findings, the judge determined there was no need for an FRO to protect plaintiff from an immediate threat or future harm.

This appeal followed. Plaintiff moved for a stay of the judge's dismissal of the TRO pending appeal. We denied the stay and accelerated the appeal.

Plaintiff presents the following arguments for our consideration:

> (1) the judge erred as a matter of law in finding that the commission of multiple predicate acts of physical violence did not establish the need for an FRO; and

> (2) the judge's decision that multiple, egregious predicate acts occurred is in and of itself adequate

9

for an FRO without the need for conducting a full analysis of the factors listed in N.J.S.A. 2C:25-29(a).

## II.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal

conclusions and will review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

When determining whether to grant an FRO pursuant to the PDVA, the judge must make two determinations. See Silver, 387 N.J. Super. at 125-27. Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver, 387 N.J. Super. at 125 (citing N.J.S.A. 2C:25-29(a)).

If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second

prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127. Subsection (a)(7) became effective January 8, 2024, and is addressed in our opinion.

"[T]he Legislature did not intend that the commission of . . . one of the[] [enumerated predicate] acts [of domestic violence] automatically mandates the [entry] of a domestic violence [restraining] order." Ibid. The factors which the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety;
>
> (6) The existence of a verifiable order of protection from another jurisdiction; and
>
> (7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes

12

with, threatens, or exploits a person's liberty, freedom, bodily integrity or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse . . . Coercive control may include, but shall not be limited to:

(a) isolating the person from friends, relatives, transportation, medical care, or other source of support;

(b) depriving the person of basic necessities;

(c) monitoring the person's movements, communications, daily behavior, finances, economic resources, or access to services;

(d) compelling the person by force, threat, or intimidation, including, but not limited to, threats based on actual or suspected immigration status;

(e) threatening to make or making baseless reports to the police, courts, the Division of Child Protection and Permanency within the Department of Children and Families, the Board of Social Services, Immigration and Customs Enforcement, or other parties;

(f) threatening to harm or kill the individual's relative or pet;

(g) threatening to deny or interfere with an individual's custody or parenting time, other than through enforcement of a valid custody arrangement or court order pursuant to current law including, but not limited to, an order issued pursuant to Title 9 of the Revised Statutes; or

13

(h) any other factors or circumstances that the court deems relevant or material.

[N.J.S.A. 2C:25-29(a).]

Although the court is not required to incorporate all these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 401-02 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between . . . plaintiff and defendant including previous threats, harassment, and physical abuse," and on "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995).

The court must also exercise care to "distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017). The PDVA is not intended to encompass "ordinary domestic contretemps." Corrente, 281 N.J. Super. at 250 (emphasis added). Rather, "the [PDVA] is intended to assist those who are truly the victims of domestic

14

violence." Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)).

The second prong under Silver "requires the conduct must be imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (quoting Silver, 387 N.J. Super. at 126-27). A person is guilty of simple assault if he or she "[a]ttempts to cause . . . bodily injury to another" or "[a]ttempts by physical menace to put another in fear of imminent serious bodily injury." N.J.S.A. 2C:12-1(a)(1) and (3).

In A.M.C. v. P.B., we held:

> [w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO "is most often perfunctory and self-evident." But even when the predicate act does not involve physical violence, the trial court must still evaluate the factors in N.J.S.A. 2C:25–29 a-(1) to -(6) to determine whether an FRO is warranted to protect the victim from an immediate danger or to prevent further abuse.
>
> [447 N.J. Super. 402, 417 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 127).]

In A.M.C., a Family Part judge denied the plaintiff-wife an FRO even though the judge found that her "husband . . . physically assaulted her on two separate occasions over a three-week period." Id. at 405. The judge determined an FRO was not necessary because plaintiff had " 'failed to establish even a mere

likelihood that the parties would continue to interact in the future' or that [the] defendant posed a threat to her." Ibid. The judge noted the relatively short duration of the marriage, the fact that the parties had no children and would not be "interacting as parents," and that plaintiff failed to prove all but two incidents of domestic violence, despite alleging many, mitigated against the need for an FRO. Id. at 411-12.

We rejected the judge's finding that the absence of children or the duration of marriage were reliable indicators of defendant's future conduct, id. at 416, and held that courts may consider two key factors: "(1) a lack of evidence demonstrating a history of domestic violence or abuse; and (2) the commission of a predicate act that does not involve physical violence against the victim," id. at 414.

We examined a similar issue in two other cases. In McGowan v. O'Rourke, we concluded that a single act, without a domestic violence history between the parties, warranted issuance of an FRO because the defendant had "mail[ed] graphic pornographic pictures [of plaintiff] to [her sister] and impl[ied] that they may be sent to [plaintiff]'s workplace and her son." 391 N.J. Super. 502, 506 (App. Div. 2007). And, in C.C., we rejected the defendant's argument that an FRO was not necessary to protect plaintiff because there was

16                                                                    A-3995-23

no history of domestic violence. 463 N.J. Super. at 435-36. In that case, the parties had engaged in mostly a texting relationship after meeting at a gym.

When the plaintiff rebuffed the defendant's attempts to meet up in-person outside of the gym, the defendant sent the plaintiff "a barrage" of "vulgar, insulting, and threatening" text messages over approximately twelve hours and the plaintiff sought a restraining order after receiving a text message from the defendant showing her address. Id. at 426. Although in that case we primarily considered whether the parties had a "dating relationship"—given that the parties had never gone on a date in-person—we also addressed whether the absence of any prior history of domestic violence precluded the plaintiff from obtaining a FRO. Id. at 430.

We concluded that the parties' relationship was a "dating relationship" under the PDVA and further that the plaintiff's fear that the defendant had found out where she lived combined with his offensive text messages was sufficient to support the Family Part judge's decision that the defendant's conduct had placed the plaintiff in fear and that an FRO was thus "necessary to protect plaintiff from immediate danger or future abuse." Id. at 435-36; see N.J.S.A. 2C:25-29(b); Silver, 387 N.J. Super. at 127.

Here, the judge made no finding under the second <u>Silver</u> prong—or under <u>A.M.C.</u>—that a single predicate act involving the use of physical force and violence is sufficient to grant an FRO. Although the judge noted the parties no longer live or work together and plaintiff delayed seeking a TRO, he engaged in no principled analysis of why he found that to be the case and made no evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(7). We, therefore, conclude that reversal and remand is warranted.

In sum, we reverse and reinstate the TRO and remand to a different judge to determine whether an FRO is necessary under <u>Silver</u> and the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(7) because he made credibility findings and to avoid the appearance of bias or prejudice. <u>See</u> <u>R.L. v. Voytac</u>, 199 N.J. 285, 306 (2009).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3995-23