# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3979-24

D.L.L.,[1]

    Plaintiff-Respondent,

v.

E.E.S.,

    Defendant-Appellant.

_____

          Submitted February 3, 2026 – Decided May 1, 2026

          Before Judges Susswein and Augostini.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-2354-25.

          Hendricks & Hendricks, attorneys for appellant (Patricia M. Love, on the brief).

          Paone Zaleski & Murphy, attorneys for respondent, have not filed a brief.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the record and the privacy interests of the parties. See R. 1:38-3(d)(10).

Defendant E.E.S. appeals from the entry of a final restraining order (FRO) issued pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant contends that he was denied due process during the plenary hearing and that the trial court erred in finding that he committed the predicate act of harassment, N.J.S.A. 2C:33-4. Having reviewed the record in light of the applicable legal principles, we reverse and remand for a new FRO hearing before a different court.

I.

Plaintiff D.L.L. and defendant dated for approximately six years, which was more of an on-again, off-again relationship towards the end. On May 27, 2025, plaintiff obtained a temporary restraining order (TRO) against defendant pursuant to the PDVA. The complaint alleged that on May 27 defendant showed up unannounced at plaintiff's home, looking to speak with her but she was not home. Instead, he spoke with plaintiff's adult son. The complaint alleged a separate incident having occurred in July 2024, and noted that since then, defendant continued to text, call, and email plaintiff. She also alleged defendant committed prior acts of domestic violence and violated the TRO.[2]

---

[2] The record provided on appeal does not include plaintiff's subsequent amended complaint in which she detailed prior incidents of domestic violence and the

Plaintiff, represented by counsel during the FRO hearing, called her son, J.G., as a witness who described the parties' relationship as "inconsistent . . . [s]ometimes [] great[,]" while "most of the time, [] [there] was yelling and arguing." J.G. also testified regarding the evening defendant showed up at their residence. He explained that while home alone that evening, he heard "very loud banging" on the door around 8:00 p.m. Seeing defendant at the front door, he grabbed a knife, and then answered the door. He spoke with defendant, asking him to leave or he would call the police. J.G. acknowledged that the encounter lasted "no more than ten minutes," and defendant remained on the sidewalk during their conversation. Defendant left voluntarily.

Plaintiff described her relationship with defendant—her former fiancé—as "volatile." She contended that defendant struggled with alcohol abuse over the years. Plaintiff explained that their relationship ended in March 2025, and that she sent defendant a final text on March 29, telling him she was now dating someone else and to stop contacting her. Despite this communication, plaintiff testified that defendant continued to text her.

---

predicate act of contempt. See R. 2:6-1(a)(1)(l) (providing the appendix on appeal shall contain "such . . . parts of the record . . . as are essential to the proper consideration of the issues"). We can discern, however, those prior incidents from the parties' testimony during the bench trial.

A-3979-24

Plaintiff testified about the May 27 incident, claiming that defendant did not notify her that he would be dropping off her belongings. During his testimony, defendant refuted this assertion but acknowledged that plaintiff had blocked his text message. Indeed, the text messages admitted into evidence contained an April 30 text from defendant stating that he would be "mailing or dropping off a box of stuff soon." Nonetheless, plaintiff admitted that she was not home that evening when defendant showed up.

Plaintiff also testified about the July 22, 2024 incident. She described defendant as becoming "very angry," grabbing her belongings, throwing them down the stairs, and telling plaintiff "to get out of his house." As plaintiff left the house and went to her car, defendant "ran out of the house and backed his car . . . in front of the driveway" preventing plaintiff from leaving in her car. Plaintiff further testified that there was "a lot of name-calling," and that defendant had also "kicked" and "shov[ed]" her. Plaintiff called the police, who subsequently arrested defendant.

Plaintiff declined a TRO because she "still wanted a relationship with [defendant]." After this incident, plaintiff testified that the parties continued to communicate with each other for several months.

A-3979-24

Plaintiff described a series of alleged prior acts of domestic violence during their relationship. She also alleged that defendant violated the TRO on June 6, 2025 by bringing mail sent to his home but addressed to plaintiff to the courthouse and giving it to one of the "bailiffs" to hand to her.

Defendant, self-represented during the FRO hearing, testified on his behalf. He explained that he went to plaintiff's home on May 27 to drop off her belongings, contending that he tried to notify her in advance, but she had blocked his text messages. He testified that he left two boxes on her front porch "with a package she got in the mail . . . and [] stood back to the easement." Defendant admitted that he sent non-threatening messages to plaintiff after she told him to stop.

Concerning the July 22 incident, defendant acknowledged that he parked his car in the front of his driveway, preventing plaintiff from leaving. He contended, however, that he left the car keys in the ignition and told plaintiff she was free to move the car out of the way. Defendant denied intending to harass plaintiff by doing so but explained that he just wanted to have a conversation with her.

A-3979-24

Following presentation of the evidence, the court issued a decision from the bench. The court found plaintiff and J.G. credible; did not find contempt but found harassment. Thus, the court granted the FRO. This appeal followed.[3]

## II.

Our review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 412 (1998). "We give particular deference to [family] courts because they 'possess special expertise in the field of domestic relations.'" Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005) (quoting Cesare, 154 N.J. at 412-13 (citing Brennan v. Orban, 145 N.J. 282, 300-01 (1996))). Therefore, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (quoting Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974))). We owe no special deference, however, to a trial court's "interpretation of the law." Ibid. (quoting D.W. v. R.W., 212 N.J. 232, 245 (2012)).

Defendant contends that the trial court erred by denying him due process during the plenary hearing and by finding that he committed the predicate act of harassment. Specifically, he argues the trial court inappropriately interjected

---

[3] Plaintiff has not participated in this appeal.

A-3979-24

during the hearing, interfered with his cross-examination of witnesses, and advocated for the plaintiff throughout the proceeding. He further contends the court erred by making no specific finding that he acted with the requisite intent to harass plaintiff.

After carefully reviewing the record, we conclude defendant's assertion that he was denied a fair trial because of the trial court's inappropriate interference and partiality during the proceedings is "without sufficient merit to warrant discussion in a written opinion." R. 2:11-3(e)(2). Instead, we focus on defendant's contention that the trial court made no finding that he had a purpose to harass plaintiff. We agree with this assertion.

A.

Under N.J.S.A. 2C:33-4, in relevant part, a person commits harassment if "with purpose to harass another, he [or she]:"

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

> A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.
>
> [Ibid.]

A finding of purposeful conduct is "integral to a determination of harassment." Peterson, 374 N.J. Super. at 123 (quoting Bresocnik v. Gallegos, 367 N.J. Super. 178, 183 (App. Div. 2004) (internal quotation marks omitted)). Moreover, "[w]e have consistently required a purpose to harass as an element of harassment under the [PDVA]." State v. L.C., 283 N.J. Super. 441, 449 (App. Div. 1995) (internal quotation marks omitted); see also State v. Hoffman, 149 N.J. 564, 576 (1997). "[W]ithout the requisite intent to harass [defendant's] conduct was not actionable under the [PDVA]." L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 536 (App. Div. 2011).

We recognize that "[a] finding of a purpose to harass may be inferred from the evidence presented." Hoffman, 149 N.J. at 577; see also J.D. v. M.D.F., 207 N.J. 458, 486-87 (2011). However, in this case, the court did not sufficiently explain what it was in defendant's conduct that led the court to conclude his purpose in going to plaintiff's house at 8:00 p.m. on May 27 was to harass her. Other than noting that by showing up at her house, "uninvited and unsolicited" at night was a "very scary message," the court did not articulate specific findings

of fact that led it to conclude that defendant's intent was to annoy or alarm plaintiff. N.J.S.A. 2C:33-4(a).

The court concluded that defendant did not notify plaintiff of his plan to drop off her belongings at her house. However, the court made no mention of the April 30 text message from defendant advising plaintiff that he would either be "mailing or dropping off a box of stuff soon." There was no evidence presented of any threatening statements or behaviors by defendant during the encounter with J.G. In fact, J.G. testified that defendant remained on the sidewalk during their conversation and the entire encounter lasted "no more than ten minutes." The court did not articulate why it may have inferred from these facts that defendant acted with the purpose to harass.

The court found that defendant pursued the relationship with plaintiff even though she no longer wanted a relationship with him and had told him to "stop." In making this determination, the court relied upon a series of text messages marked as P-1 and P-2. In rendering its decision, the court referenced P-1 and P-2, stating, "by the way, they're admitted into evidence . . . as party admissions."

Defendant, now represented by counsel on appeal, raises for the first time that he was "never afforded the opportunity to object to [the exhibits']

9

admission," and that no proper foundation was established for these documents. The record supports defendant's assertion that these exhibits were not properly authenticated; however, defendant acknowledged sending these text messages to plaintiff after she ended their relationship and stopped communicating with him but denied intending to harass her. Instead, defendant claimed that his purpose was to have a conversation with her because "she's the best thing that's ever happened to me, and I love her." Other than generally finding plaintiff credible, the court made no specific findings as to why it rejected defendant's explanation and found that he acted with the purpose to harass.

The court also found the July 22, 2024 incident "very concerning," but made no finding that defendant acted with the purpose or intent to harass plaintiff on that day. See Peterson, 374 N.J. Super. at 123-24, 126. Plaintiff testified that following this incident, she continued to communicate with defendant and viewed him as her "forever person." By not making a finding on the purposeful element of harassment, the court did not satisfy the first prong of the Silver two-prong test. Silver v. Silver, 387 N.J. Super. 112, 126-27 (App. Div. 2006).

After the presentation of the evidence, the court found:

> There's no question that plaintiff has met her burden of proof . . . to establish the right to a final restraining

10

order. She testified she's concerned for her safety. I understand why she would be concerned for her safety based on defendant's behavior.

B.

Unless a trial court finds that a plaintiff proves all of the elements of at least one predicate act, it need not address the second prong of Silver. See ibid. In this case, even though the court purportedly found harassment, it made no findings as to the second prong of Silver, namely, whether a restraining order was necessary to prevent future domestic violence. Ibid. Although defendant does not raise this issue on appeal, we note that the trial court made no findings as to why a permanent restraining order was needed and did not consider the N.J.S.A. 2C:25-29(b)(1) through (7) factors. We recognize that in many cases the need for a final restraining order "to prevent further abuse," N.J.S.A. 2C:25-29(b), is "self-evident." Silver, 387 N.J. Super. at 127; see also S.K. v. J.H., 426 N.J. Super. 230, 233 (App. Div. 2012). On remand, if the trial court finds a predicate act of domestic violence, it shall determine whether the second prong of Silver has been met after considering the N.J.S.A. 2C:25-29(b) factors.

Our Supreme Court's guidance in J.D., 207 N.J. at 481, bears repeating here:

> Many litigants who come before our courts in domestic violence proceedings are unrepresented by counsel;

11

> many are unfamiliar with the courts and with their rights. Sifting through their testimony requires a high degree of patience and care. The pressures of heavy calendars and volatile proceedings may impede the court's willingness to afford much leeway to a party whose testimony may seem disjointed or irrelevant. But the rights of parties to a full and fair hearing are paramount.

We do not hold that defendant's rights were violated in this case. However, as the Court in J.D. held, the trial court "did not sufficiently articulate" a critical finding, "and our independent review of the record leaves us unsure that there is sufficient evidence to sustain the issuance of the order." Id. at 488. We are constrained to remand this matter to the trial court for a rehearing. Because the court made credibility findings, we order that a different court conduct the rehearing. See R.L. v. Voytac, 199 N.J. 285, 306 (2009) ("Because the trial court previously made credibility findings, we deem it appropriate that the matter be assigned to a different trial court.")

Accordingly, we reverse and remand for a new FRO hearing before a different trial court. The restraints imposed by the TRO will remain in place until the request for a FRO is resolved.

Reversed and remanded for a new FRO hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

12